Good afternoon. Can the lawyers who are going to address the court just give us your names, please? Good afternoon. We're the Defendant Appellants, Michael Reisis, R-E-S-I-S. Good afternoon, Your Honors. For the Plaintiff Appellee, Lenisha Blockman, Lynn Dowd, D-O-W-D. Mr. Reisis, you both have 20 minutes. Would you like to reserve any of your time for rebuttal? I would like to reserve five minutes for rebuttal. Okay. And just to remind you both, this microphone doesn't amplify, it only records, so please keep your voices up nice and loud. We are ready, sir. Whenever you're ready, you may sit down. Thank you. Good afternoon. May it please the court, counsel. My name is Mike Reisis, and I'm here today on behalf of Defendant Appellants Vector and Cutco. This is an appeal from a judgment and a jury verdict in plaintiff's favor for approximately $4.7 million. We've raised a number of issues on appeal. Today, with time permitting, we will focus on the following issues. One, whether defendants were entitled to a judgment now withstanding the verdict. Two, if not, whether defendants were entitled to a special oral arbitrary that they tendered. And three, whether other trial orders were prejudicial and entitled defendants to a new trial. If we are correct on any ground, the judgment alone cannot stand. First, defendants were entitled to a judgment now withstanding the verdict on the direct negligence claim. And that's count five of the Fourth Amendment complaint. Defendants owe no duty to train Jacobi McClellan not to use his phone GPS while driving. To date, the case law recognizes a duty only when a specific policy actively contributes to a foreseeable risk of harm to the public, such as when a food delivery business has a fast delivery policy that incentivizes unsafe driving. Plaintiffs presented no similar evidence that defendants had any policy or compensation structure that influenced how McClellan drove to his sales appointments. Defendants had no policy that required McClellan to, quote, deliver, close quote, his in-home presentations within a set time after he made the appointment. Unlike a pizza, the demonstrations would not get called if he was running 15 minutes late. McClellan would be paid the same either way. Defendants did not require a certain number of appointments daily. In fact, McClellan had another summer job as a lifeguard. Moreover, we did not have a policy that required McClellan to use his phone GPS while driving. On the contrary, the sales training manual specifically stated that McClellan should, this is on all caps, get directions, don't rely on MapQuest or GPS. He didn't say don't use GPS, just said don't, I mean, correct, right? Well, don't rely, you know, I think it's the same thing actually. I mean, if you're using it, aren't you relying on it? Let me just ask a harder question. To prevail on the JNOV argument, you'd have to be entitled to a JNOV on both the direct liability and the vicarious. That's the word I'm looking for. Well, Your Honor, the first point we're making here is that we're entitled, using the public standard, to a judgment notwithstanding the verdict on the direct negligence claim. Okay. And the reason I'm making that point first is this. If we were correct and the judge was wrong to deny our motion for direct a verdict on that count, then we would have been entitled to the special interrogatory. What's the standard of review for us and whether the court was correct on the direct liability count? Denial. And it's also denial on whether or not the special interrogatory should have been given. Denial on both. But what is the authority for, given the posture that the case was in when they went to the jury? Yes. Where both theories were still alive, if you will. Yes. What's the authority for saying we're supposed to look at what the posture would have been had he granted the direct a verdict that you're arguing should have been granted? Well, if you just look at, say, the language in 2-1201D, it says that, and that tries to codify the general verdict rule, but it says that you still have review after a verdict if before the verdict you made a motion to withdraw the claim, that's count five, based on insufficient evidence, which is what a motion for direct a verdict is all about, and the denial of that motion was prejudicial. The denial of that motion was prejudicial because if the motion had been granted, we, on top of the special interrogatory, on independent contractual defense, and a yes answer on that interrogatory would have controlled a verdict on the agency count. Could you have gotten to the same place since the motion for the direct a verdict was denied by proposing separate verdict forms or a different kind of verdict form? That's an excellent question. So let's suppose we had submitted separate verdict forms for count one and count five, and think it through. So the jury returns a verdict in plain favor on both claims? I'm still making the same argument. I'm entitled to a direct a verdict on count five. I get an interrogatory on count one that controls a verdict return in plain favor on count one. Flip it the other way. Let's suppose I get a verdict in my favor, in the defendant's favor, on count five. Right. Even so, I'm arguing that count should never have gone to the jury, and if it had then gone to the jury, I get a special interrogatory on count one. So although we're arguing we're entitled to a direct a verdict on count five, the most important point is if we get it on count five, but weren't even entitled to it on count one, the agency comes. Right. We still get the interrogatory. And what the judge did here, I'm sorry to say, post-trial, he winds up never ruling. He never rules on the motion for J and OV on count five because he says in so many words, well, the issue was rendered moot because we had a general verdict. So first we're going to assume that there's evidence to support both counts, so I don't have to rule on it. And since there's two issues, but the interrogatory only goes to one issue, you know it's going to get a special interrogatory. So the reasoning was circular. It assumed that there was evidence to support both verdicts when our motion changed the sufficiency of the evidence to go to the verdict on one of those claims, and the interrogatory would have control of the other claim. But my question, and I think you answered it, but I just want to be clear, is could you have, all right, from your position, judge made a mistake, should have granted the directed verdict, but I still need this special interrogatory answer. I'm going to submit a verdict form that will let me get an answer to that on the vicarious liability count. Could you have done that by proposing a verdict form where there's separate verdict forms in the special interrogatory, and this is a real violation. But you know what? Even if I have separate verdict forms, I still want the interrogatory. Right. I don't need that interrogatory. Right. Because even if I get a verdict in my favorite on count five, I want the interrogatory to control a verdict on count one. Right. So either way, I need that interrogatory. But even if you get that special interrogatory. Yes. It doesn't even necessarily control on count one. The special interrogatory was whether or not he was an independent contractor. Is that correct? That's it. But that went out bar vicarious liability on the issue of whether or not he was an agent. Yes, they were. Under the jury instructions. All right. Look at our Supreme Court's case in Lawler v. North American Corporation. They addressed that directly. Well, I can only tell you, Justice Walker, that we had jury instructions in this case. The 50.10. And the last sentence of that instruction says, One who engages an independent contractor is not liable to others for the negligence of the contractor. So if under the jury's instruction, the jury finds. You cannot be an independent contractor and still be an agent. Not under these instructions. Under these instructions, it's an either or. Now, the point, if they try to propose an non-IPI instruction, they said that you could be both. The judge refused to give it. So under these instructions. Did you object to it? Yes. And the judge refused to give it. So he tried to get it. Yep. You objected. Court agreed with you. Right. Now you're here arguing that the instructions that you prevailed at precluded or support your position for a special interrogative. Yes. Because if the judge had given what they'd asked for, you wouldn't be making that argument. If the judge had given me the interrogatory. No, if he had given the instruction that the plaintiff wanted. Well, if he had given that instruction. You'd be saying. I'd be complaining about that non-IPI instruction. Yeah, that was a terrible instruction, wasn't it? Right. No, I'm not saying right now. No, I understand. I understand. I would've got another. You know what? Then I would've had another thing to argue about. Well, woulda, shoulda, coulda. You know, here we are. That's right. And we're on a record under this set of instructions that tells the jury that a yes answer to that interrogatory, an independent contractor, means we're not liable for the negligence of Jacoby McCall. That's what the instruction. And you have to construe the interrogatory in conjunction with the interrogatory. There's no two ways about it. The only other thing I want to say about the direct negligence claim is we not only argued duty. We also argued proximate cause. McCall already knew from his driver's education class that it's dangerous to use his phone GPS while driving. He testified that our failure to warn and train did not cause him to use his phone while driving. Nothing that defendants did or did not do caused him to look down at his phone. It is black-letter law that what a party is arguing with a hazard. No further warning is required. Defendants are entitled to a judgment not asserting a verdict on the direct negligence claim. Second, we submit that we are also entitled to a judgment NOB on the agency claim on Code 1 of the Fourth Amendment complaint. Specifically, one, McCall agreed to conduct his business as an independent contractor. Two, he did not hold himself out as defendant's employee. Three, he developed his own sales method and customer lists. Four, he set his own schedule. Five, he paid his own taxes. Six, he furnished his own car, phone, gas. Seven, he did not have to go into the office or check in daily. Eight, well, other than promising that he would act ethically and above board at all times, he testified that everything else was under his control. And he also testified that he viewed himself as an employee. I mean, there was a question of fact here, right? Excuse me. Not based on that because his testimony about being on the job is not admissible or probative on the issue of agency under Wolf v. O'Barris cited in our brief. Just because somebody says, I'm on the job, I'm an employee, I'm an agent, doesn't prove the fact is so obvious. It's not even probative. It's not binding on us. It's not probative. So what he says, and by the way, every liability case involving alleged agency where the employer or the principal tries to escape liability for the acts of another. Yes, yes. They always contend that, you know, it wasn't my agent, you know, he's an independent contractor. Excuse me. Yeah. And you look to the facts. Happens all the time in workers' comp situations. You look to the facts of the case. That's right. Neither party's statement controls the fact that the principal, the alleged principal, says, well, wait a minute, we had all this language, we did everything else, therefore, he was not my agent. That's not determinative. Well, I would respectfully agree with that. I would certainly agree that no single factor is determinative. And for that reason, I would refer the court to the franchiser-franchisee cases we've said in our brief, specifically Oliveira Brooks, Salisbury, Slates, or Banner, holding similar circumstances that there was no agency shown as a matter of law, despite the fact that the franchiser had an operation manual, conducted training, supervision, quality control, record-keeping, conducted periodic inspections. Nothing about this case is different from those cases. Third, we already talked a little bit about the special laboratory, and I don't think I need to cover that again. I think the questioning pretty much developed the argument I wanted to make on that. Fourth, the trial court erred, we respectfully submit, in how it handled the sales agreement. I'm sorry, I do have one more question. Did you cite a case, I did not find one, but it may be in your very thorough and excellent briefing on both sides, in which the case, your argument as I read it is, we should have gotten a directed verdict on count one, so that we could have. I'm sorry, on count five, so that our special laboratory would have been tendered on count one. Yes. Do you have any case in which the case, the way the case actually went to the jury, no special interrogatory was required, but the way the case should have gone to the jury, a special interrogatory would have been appropriate. Do you have a case like that, that's similar to yours in terms of possible. I don't have a case that's on fours in terms of the procedure, in terms of the exact procedure that was employed. I don't have that case. Other cases, but that case is going to wind up. You cited lots of cases. You bet. Okay, well, it's an interesting, I think it's a very interesting issue, but you know. You think it's what? I think it's a very interesting issue. That's the reason. That's right, that's right. And don't, I see you nervously looking at the clock. You're the only case up to date. I realize that, and I appreciate the court's indulgence. I think what's really troubling is how the trial court handled the sales agreement that McClellan signed and our independent contractor defense. First, the trial court erred by allowing the plaintiff to cross-examine Paul Matheson, a vector witness, the Director of Legal Affairs, on contracts of adhesion and the doctrine of unconscionability. The adverse examination is set forth on pages 43 and 44 of our opening brief. Despite repeated objections on relevancy grounds, the court allowed the plaintiff to suggest that the agreement that Jacobi McClellan signed was a contract of adhesion and unconscionable. The plaintiff had no good faith basis to ask those questions. He did not. And I think the trial court agreed with you that that was an error, but I'm actually confused because you're relying on that contract to say, no, no, no, it was an independent contractor relationship, so why doesn't the plaintiff get to inquire into whether that is or isn't a truly negotiated contract? The question was asked in terms of whether or not there was a contract of adhesion. That's a question of law for the court. Now, if he simply asked, did you negotiate that contract, Mr. McClellan, well, that would be one thing. But what is a contract of adhesion to the jury? And then to throw out the term, well, unconscionable, that's the first error. It had no relevancy. This is a tort case. It's only a tort case. The enforceability of that agreement is not germane to any issue in the case. But you say it should have been included in the agency. That's right. So it doesn't have relevancy or it doesn't? It isn't. The agreement has relevancy. Whether or not it's, quote, unconscionable, close quote, is that relevant in a tort case? And who would decide that issue? Would it be a judge? That's a question of law if it's a contract of adhesion, whether it's unenforceable. No jury considers that. That's number one. You go to the IPI instruction. So in all the IPI instructions written, it lists a number of factors. The designation of the status of Jacobi-McClellan in the agreement is not listed in the IPI form because you have to plug in what are the factors. And at the very end of the instruction, it talks other factors, other relevant factors. The judge, there's no question, the agreement is a relevant factor. But the judge said, show me the part of the case that requires me to put that into the instruction and I'll get the instruction as tendered. There are plenty of cases that say it's a relevant factor. I think I heard during oral argument today that it's a relevant factor. Well, you argued to the jury that it was a relevant factor, that they should consider it. Yeah. And then the plaintiff argued that also. So that was all presented to the jury for their consideration. And I haven't seen anything that indicates that they didn't, did not consider that as a relevant factor. Well, let's see. First we have in closing argument, plaintiff's counsel saying that we were trying to perpetrate a fraud on the public and we were engaged in a shell game. That was in reference to our independent contractor defense. That was based upon a contract that the jury, that was not part of the jury instructions. And you argued the opposite side. Right. After we were accused of fraud. Right. And it was all a shell game and it was unconscionable and it was a contract of adhesion. Right. Right. I mean, to me that's... My guess is you would have argued that agreement anyway. Yes, we would have. We would have argued the agreement. And it would have been improper and it was improper for plaintiff's counsel, who is a very experienced, able attorney, to say, we're engaged in a fraud on the public, this is a shell game, it's not right for Jacobi McClellan to be on this all by his lonesome. And your objections were sustained and the jury was instructed to be fair. And, and, and, and... To us or not to us? Yes. Okay. Yes.  Objection sustained, continued with the argument. Objection sustained, continued with the argument. Three times objection sustained, continued with the argument. Now, you know, it's one thing, I'm doing an argument today, and, you know, you're giving a certain amount of latitude, right? We hope. But, but, but, but what happened at trial in those three instances was he just, the plaintiff's attorney just charged ahead. He wasn't deterred. He wasn't stopped. There are plenty of cases that we've cited that point out that even when the objection's sustained, if you repeatedly engage in the same behavior, that presumption of, you know, curative, curative, you know, of it being cured is overcome. He was going to get those remarks out no matter what. Didn't, didn't skip a breath. One after the other. And it all relates back to this agreement, how it's a fraud, you know, how it's unconscionable, how it's a contract of adhesion. It's all part of a piece. The closing argument simply wraps it all up in a pretty bow. And for those reasons, Your Honor, we submit for, in addition to all the other arguments in our brief, we ask that you reverse the judgment and grant us relief as set forth in our brief. Thank you. Thank you very much for your time. And we'll still give you five minutes for rebuttal. Thank you. Good afternoon, Your Honors. Mr. Reusses, again, for the record, my name's Lynn Dowd, and I'm here with Trial Counsel Robert Mapleton today. May it please the Court, I'd like to address counsel's remarks and kind of highlight and provide some clarity to the important issues presented in this case. And if I could just highlight a couple of things. Some undisputed facts that Mr. McClellan went into an agreement with defendants on June 14th, 2014. Less than a month later, on July 11th, 2014, he had the collision. And I highlight that because many of these issues, it's important to think about what society knew and our perspectives and our obligations in 2014 versus what we hope we've learned five years later with respect to the various duties dealing with cellular phones. In any event, on that day, Mr. McClellan testified that he had five to seven appointments that he had to go to to do his in-home repair. Oh, which he set up, right? He set them up, yes. And there was a requirement. There was testimony that there was a requirement for at least one sale a week. This was not a two-a-day, one day a week. But, you know, getting sales would throw a hundred balls in the air and you hope one comes down. So that if they didn't have one sale a week, they could be terminated and they were on notice of that. So there was that pressure. And that's just one of many facts illustrating a situation the defendants created, an entire sales environment and business model. And I'm not going to repeat the abundance of evidence in our brief, but I could highlight certain things, and I hope to do that. But before I get into that, to give clarity to the issues, it's important to just focus on what were the issues, as opposed to what was alleged in our complaint. Three issues went to the jury. Number one, that the defendants were vicariously liable for Mr. McClellan's admitted negligence. Specifically, quote, McClellan was an agent of Vector Marketing and or Cutco Corporation. We alleged he was an agent. It was our obligation to prove it. It was defendants' obligation to disprove it. Number two, defendants were directly negligent. For one, they failed to provide appropriate training with regard to the use of cellular devices in obtaining route information to sales calls. And number three, it's going to the flip side of that coin, defendants were negligent because they failed to provide training to sales representatives to not use their cellular devices while doing sales calls. So let me get into each of those in a moment, but if I could talk about some of the procedural issues before the court. The jury came back after hearing a very well-presented trial guilty on all three counts. So now it's the defendant's burden to prove reversible error, and that's never an easy task. What do you mean they came back guilty on all three counts? They just came back with a general burden. That's right. It doesn't say which theory they got. It just says. That's exactly the problem they have today. Three were presented. They came back with guilty. So as the court was saying. Thank you. Thank you very much. Rival on any, one, or all of the counts. We don't know. We don't know. And so the issue before the court is can the verdict be sustained on any one of the three counts? The answer is yes on any one, and I submit all three, and I'll get into why. But part of the defendant's burden here is when, and this is by statute under 1201, which codifies the two cases I've cited that they pointed out were about 70 years old. But when we read those cases, the current statute, 2-1201, is no different. It's a codification. There's many tools for the defendants to raise and preserve the errors as they go along. Of course, throughout the process, a contemporaneous objection with proper grounds laid forth. Then they get into a motion for a directive verdict, a post-trial motion, and then here we are on appeal. But also, when you're presented with a general verdict, and there's many, many cases, there's 100 years of precedent on this. I've had this case, this history come up in many appeals, 100 years of precedent on the general verdict rule. It's incumbent upon the defendants to demonstrate which, if any, of those counts are erroneous and have reversible error in them. Even if one of the three or two of the three have reversible error, if there's one valid count, the law requires the verdict to be sustained. These are in that they all have reversible error. We submit they're wrong. That's my short answer. Okay. Justice Walker's point is he gets it, but he has to show that both theories. You're bringing this up. Jumping ahead, on the agency count, there's an abundance of competing evidence, a pure question of fact. I think that's laid out in both parties' briefs. But the issue is the manifest way. And he used his own vehicle. He used his own cell phone. He was not required to attend weekly meetings. He was not required to check in daily. He was not required to work in an office space. He could either borrow or purchase a special kit. He did not have to, he was, he didn't pay taxes. I mean, the list goes on and on as to why he would be an independent contractor. He could not represent himself to others that he was an employee, even though he testified he thought he was, which made no sense. So there's a whole bunch here. Yes, there is, Your Honor, and that's the defendant's list of evidence. And I'll present our list of evidence. There's two different lists of evidence, legitimate evidence that went to the jury. They resolved the competing issues of fact and evaluated the witness's credibility. Here's some of our evidence. Contrary to their contention, and much of this comes out through other witnesses and cross-examination, these defendants absolutely micromanaged their sales representatives. They had restrictions on advertising and marketing. There was no online marketing without company approval, and the testimony was that would be rare. They were required to do the in-home demonstrations. Defendants provided the tools, the kit, with the rope, the knives. I have never seen a case where an alleged agent, here, Mr. McClellan, was given a script of the exact words to say to a customer. If that's not evidence of agency ---- Real estate agents use scripts all the time, and they're usually independent contractors. I'm sorry. Who uses scripts? Real estate agents. They use scripts all the time. I know. I actually ---- real estate agents, and I work with a lot of them, they're a unique animal. And every, I think, real estate case has to be decided on its own facts, because I think there are some cases that would come up finding them to be truly independent contractors, and others where they would be agency. I know of realtors who go out and they attend sales, marketing. They really ---- Attend weekly meetings? He was not required to attend weekly meetings. He was required to phone in daily. It was more controlled than weekly. He was assigned a supervisor. Realtors don't have supervisors. Mr. McClellan was given a supervisor. And if I could, I think the, if the Court looks at more of a testimony, I'd like to bring to the Court's attention the testimony of Joshua Dix. He was the company mentor and supervisor to whom Mr. McClellan was assigned. Under his own testimony, he stated that Vector had the right to control McClellan. And I'm going to read that testimony. It's in our brief. It's on page 580 of the record. Question. Certainly Vector, through the Olin Park office, had the right to control certain actions of Mr. McClellan, the sales rep, in the summer of 2014. Yes or no? Answer, yes. He testified they had the right to control. That is the law. That's the end of it. Right there. But then Paul Matheson, Vector's legal affairs manager, he did not disagree with his testimony on page 611. I've cited the script they were given. And I can go back to the list and go on and on. They required minimal sales or they were threatened with termination, realtors or not. Real estate agents can hang their license with a broker and not have a sale for over a year. They were given a training manual. It was called the Blue Book. The sales reps were instructed to read it and take it with them and use it. If they deviated from the manual, they were threatened with termination, realtors or not. Step by step, they were given exact step-by-step instructions on how to perform the in-person presentation. Realtors or not. They're free there to go and talk to prospective leads and customers. That was only designed to help them. That wasn't to lock them into anything. That's for the jury to decide, Your Honor. That's their position. The jury is here. They heard the evidence. The jury could evaluate. Their witnesses testified. Some of this evidence meant X. Other witnesses said it meant Y. Sure, but the issue before us is the manifest weight of the evidence. And it seems to me that there may be more evidence in favor of showing that there are definitely independent contractors than there is. Well, under the manifest weight standard, the defendants are compelled to show that the jury's findings are unsupported by the evidence, that the findings were arbitrarily capricious, and it's just not there. I can tell you, even as I stated earlier, I'm not sure that decides the issue. Even if they are actually independent contractors, there's still something else, which I raised earlier, which I think is even more important, and maybe nobody heard me. If you wouldn't mind repeating it, Your Honor, I'd like to address it. Well, I think the real issue is that you can be an independent contractor and still be an agent. Exactly. And thank you. I was going to get into that. That's part of my point. Notwithstanding that they presented evidence that Mr. McClellan was an independent contractor, we presented evidence he was an agent. And what is the most important factor in determining agency is the right to control. And I've delineated the evidence that we presented to the jury and argued proves there's a right to control. Throughout our brief, we've cited various cases that look at just one of those factors and say that is evidence of agency. It doesn't mean it's dispositive, but it is evidence of agency for a jury to consider. And our Supreme Court refers to that as the cardinal consideration in a lot of cases. Yes, sir. And now the point you're making is very important. And we cited the Petrovich case, which actually Mr. Napleton and I had the pleasure of preparing 20 years ago. And ironically, that was the case where we took the 100-plus years of precedent of agency in Illinois and applied it to an apparent agency HMO contract. So in effect, it was somewhat of a breakthrough case. But the principle is the same. It was the same leading up to it. It's the same there. There have been many cases cited thereafter, and we cited them in our briefs back then. The point being our Supreme Court has said that it doesn't matter if you claim to be an independent contractor, if you have all those factors of, you know, how you pay them, you tell them they can't call themselves an agency. It's what the principle does. That is what is dispositive of whether or not the actor is, in fact, also an agent at the same time of being an independent contractor. And we presented proof that Vector and Cutco retained the right to control Mr. McClellan, notwithstanding how they paid him or any of that other stuff, but they retained the right to control him, and they did. They are the ones that promulgated and mandated, with rare exceptions, you had to go to the home and do in-home presentations. A true independent contractor would have been out there on eBay, Amazon, doing everything they could to get sales. Okay. But the jury was instructed. Let's start again. The jury was instructed. If you were independent contractor, you are not an agent. That's how the jury in this case was instructed, correct? One who engages an independent contractor is not liable to others for the negligence of a contractor. That's how the jury was instructed in this case. They were given a definition of an independent contractor? And they were told if it's an independent contractor, it's not an agent. That's what the jury was told. One who engages an independent contractor is not liable to others for the negligence of the contractor. And they were also told what an agent is. And the jury had to decide. Well, are we giving conflicting instructions? What's going on here? Because they were told, I think, if you're an independent contractor, you're not an agent. That's what they were told. I submit, Your Honor, that the definition of the agent, along with all the other instructions, and they were actually told what an independent contractor is and what an agent is. And remember, and they were given the issues instruction. The issue they had to decide was, was McClellan an agent? And with their verdict, they came back with the finding of yes. And so the special interrogatory essay. Well, maybe they came back on direct liability. You don't know. Exactly. We don't. But yes. And that's why anyway you analyze this by the form of jury instructions. I find these jury instructions very confusing. And I know you all agreed to these parts of it. But it says in the instructions, I believe it says if you're an independent contractor, you're not an agent. And then it also says you may be an agent even if you're not an employee. So I find these instructions somewhat confusing. And the jury was given the issues instruction and asked the question, is he an agent or not? And their verdict, the general verdict says yes. And that's what they had to test. Was he an agent? And a better question, they could have tested both theories. Did defendants have the right to control McClellan? That would pierce these words, agent versus independent contractor. They could have tested the ultimate issue many, many ways. They did not. But as a matter of law, even if they asked the independent contractor question, if they were allowed to ask it and the jury said yes, as a matter of law, that did not disprove agency. That just meant he was an independent contractor. And our evidence in the verdict showed he was also an agent. And actually, there's another case we cited that I'd like to direct the court's attention to, if I may. That is the McGovern case that actually the defendant cited, where the court found that a special interrogatory was requested and it would have been appropriate, but it was denied. But the court held, the appellate court held, the failure to give a special interrogatory is not reversible error per se. And in there, the issue is whether the plaintiff's contributory negligence was tested. They wanted to ask was he contributory negligent with a yes or no answer. That interrogatory was denied. However, the verdict form, the jury did make an apportionment of fault of 20%. So that interrogatory, even if allowed to be given, tested nothing. That's the same thing here. As a matter of law, even if he was an independent contractor, he could still be an agency. A pure question of fact. But again, the court said giving a special interrogatory in that case would have accomplished nothing. The answer would not have affected the outcome. And here I submit whether or not he was an independent contractor would not have affected the outcome because we proved agency, and they didn't test that. They didn't test whether we proved agency or not. Perhaps I said enough on that point. But there's other ways that they should have raised and preserved it in addition to the specialists. And here's where I think there is a meaningful waiver of the issue. And this is Section 2-1201 dealing with the verdict forms. Counselors made, I think, a clever argument. They tried to argue that a motion for a directed verdict or the post-trial motion are the same as a motion to withdraw a count from the jury's consideration. The two decisions we have cited, Smithers and Silatech, which codify 1201, do not say that. And in those decisions. So what is the motion to withdraw? What does that mean? Okay. The motion to withdraw is for a lack of any evidence. As we know, the directed verdict in JANOV kicked in the Pedrick standard that when the court views all the evidence in the light most favorable to the non-movement, are they entitled to a verdict? We wouldn't have 1201 and this delineation if they were the same thing, if a motion for a directed verdict in JANOV were the same thing. But the court, regardless of what the plaintiffs call or assert in their motion for a directed verdict, the court is required to look at all the evidence presented under the Pedrick standard. But Silatech and Smithers and the statute say right out there that they have to move to withdraw a count from the jury's consideration on the ground that any ground is insufficient to sustain recovery thereon. And they have to show that the denial of the motion is prejudicial. They can't show any denial here. But also, the third point I want to make is the verdict form A. So if they move to withdraw that, we would be looking at a different standard here? Possibly. But they still have another problem. And that's verdict form A, which did not delineate an apportionment of liability. They didn't object to a general verdict. Verdict form A, I think, is the final nail in that coffin. All right. Moving on to the DUTIA issue. And, again, I want, you know, we have to be careful. I have to be careful. Excuse me. Because, again, in preparing for argument, let's deal with the handheld cellular device that, in this case, McClellan used. He used the GPS on his cell phone to calculate how late he was going to be to his next appointment, mindful that defendants required he contact the customer and tell them how late he was going to be, and then the customer had the option to say, you can come late or reschedule. That's not independent contractor conduct when you require them to do something vis-a-vis their customer relationships. But here, if I could refer the court to the testimony of Joshua Dix, and I pulled it right out of the letter, pages 290 and 291. When he was questioned, these are lines 7 through 8, he was asked about they are instructed, they meaning the sales reps. They are instructed to give directions to the particular individual's residence, correct? Answer? Directions or GPS. Some managers are more specific on that than others. How about it? Did you rely on this manual where it said directions don't rely on MapQuest or GPS? Reliance and how reliable, we've all used MapQuest and other programs and have ended up in a cornfield. Reliability is not the same as do not use. The answer, I just went along the lines of just the address is fine. Question. You can plug it into your phone. Answer. Phone or your Garmin or whatever GPS you have. They sanctioned and condoned and encouraged the use of their phones to do the sales calls and to use GPS. So the next question. Whatever the navigation device the trainee might have, you weren't a stickler about get directions to the house. You were okay with letting your trainees use technology to get there, correct? Yes, correct. So it is completely incorrect to say that they prohibited the use of cell phones and GPS in any way. They allowed it and encouraged it. They told them to get directions and they told them to use their GPS on their phones. So again, this is a situation where if I pull it into the Jimmy John's decision, because that was issued prior to this accident and I submitted, put these defendants on notice that they did have a legal duty to affirmatively train on how to use GPS properly and prohibit them using cell phones, much like my brother who is a commercial truck driver who was put on notice. He's a 59-year-old man and he's told, you touch that cell phone while you're behind the wheel, you're fired. Was that the case in 2014, though? Yes. For my driving brother, absolutely. That's an important point of why they're arguing that it was Mr. McClellan's sole obligation to comply with the rules of the road. Jimmy John's says no. And here is the important testimony from that decision. If you'll forgive me, I'm flipping around my papers. I'd like to read it to the court because I think it answers the question. Here we go. This is paragraph 28 of the decision. The same arguments that defendants in part are making here today about whether or not they had a legal duty to train or alternatively to prohibit the use of handheld devices while driving on sales calls were made in Jimmy John's. And here the appellate court rejected those arguments stating whether J3, that was the actual franchise owner, the test is engaged in a course of action, creating a foreseeable risk of injury to the members of the public, thereby creating a duty to ameliorate that risk by training its employees that the rules of the road trump its 15-minute policy and must always be adhered to, even while trying to accomplish deliveries within the 15-minute window. The issue is not whether we had a formal policy, whether defendants had a formal policy. The issue is did defendants create a course of action that created an unreasonable risk of harm to the public. Here they did. They took these kids right out of high school, signed them up to do required in-home sales, put pressure on them that they had to make one sale a week or they were fired. It was a commission-only structure. It was a pyramid structure. You had to make sales to make money. They put requirements on them on how they had to contact the customers. They knew because Mr. McClellan was required to report in daily to a supervisor, they knew that day he was doing five to seven calls. I can't do five to seven driving hour-long plus presentations in a day. Told them to use their GPS, told them to use their phones, but then turned a blind eye that we don't have any obligation to tell these teenagers how to drive safely. Jimmy John says they do, and they did. We can't just assume. It's not enough to assume that your sales force is going to comply perfectly with the rules of the road or that they will appreciate the risk of doing X, Y, and Z. And it doesn't really matter because they told them to do this. As independent contractors, do they even have a right to tell them that they can't use their cell phones? Yes. Yes, they do. Because they're the provider. They hire them. He's under contract. Even as an independent contractor, when they implemented rules... You're making them an employee. It's a different question, but they clearly were not employees. They were clearly not employees. So then the question becomes whether or not they even had a right to tell them that they can't use their GPS on their cell phones if they're independent contractors. Well, they imposed... It wasn't that the agency had to do something different. I'm an independent contractor. I'm able to separate the two. But they didn't have a right. Your Honor, the issue is not whether they had a right. By them imposing requirements on the sales force to do X, Y, and Z, that gave rise to the legal duty. Once you make another actor do something, and that's the condition precedent to getting paid, to being able to use our kit, to be able to go out and sell our product, once they did that, Jimmy John's says they had an obligation. They told these kids they had to use their cell devices, they had to use GPS, they had to phone in, they had to do a lot to comply with their jobs. They created, the defense created the risk of harm to the public. It was their obligation. And, you know, under the old... I want to give you just a couple of moments. Sure. So you can get it all out. And, you know, under the old Kunis v. Brennan, Lance v. Senior, and in those cases I argued early in my career, but it's the same. You know, only this court can decide if there's a legal duty owed. And any time there's an allegation of whether a legal duty is owed, it's pretty simple. There's four factors. What's the reasonable foreseeability of harm? This situation, this pressurized sales model, high. Or I should say it's reasonably foreseeable. The likelihood of injury, high. He's going from Naperville to the south suburbs on an expressway running late. And I think the testimony was then at least 65 miles an hour when he collided into Mr. Blockman. Magnitude of the burden of guarding against the injury, nothing. The evidence showed that Mr. McClellan was a model sales rep. He did whatever these defendants told him to do. He was compliant. After the accident, it's amazing. He got back in the saddle and did more sales calls. If he had all the materials in place, it would have cost them nothing to say don't do it. Just like commercial truck drivers are told. The consequences of placing the burden on the defendants, delimitous. Put it in your manual. Put it in the blue book. This kid read that blue book cover to cover. State what they have to do. They told him what they have to do. Now tell him what they don't have to do. And another element is public policy. This court is the arbiter of the state's public policy. Certainly in 2014, if not today, it is an ongoing crisis and matter of urgent public policy to get everybody off their cell phones while they're driving. And unless the court has any questions, we submit there's ample evidence on any of the three counts or all three to warrant an affirmance. Thank you. Thank you very much. Thank you. If this verdict was not tested because it's a general verdict, it's also because the trial court made certain rulings before and after verdict that were prejudicial to us. We didn't get a directed verdict on the direct negligence claim, count five. If we get a directed verdict on that claim, then the inter-auditory could control on count one the agency verdict. Counsel referred to the fact that there were three claims or three counts. There are only two counts as to us. I think what counsel meant to say was there were three defendants because Jacoby McClellan was the third defendant. There's only two claims here. If one of those claims gets knocked out before the case goes to the jury, the inter-auditory can control on the other claim. Counsel talked about how we made the wrong type of motion. We should have made something called a motion to withdraw. Honestly, how that motion to withdraw is different than a motion for a directed verdict, counsel didn't say either in the brief or in an argument today. A motion for a directed verdict is based on insufficient evidence that requires the court to withdraw the claim from the jury's consideration. What counsel is talking about in a motion to withdraw is the same thing. I don't care what we call it. If you want to call it a motion to withdraw instead of a motion for a directed verdict, it's fine by me. What is your response to her argument that the special inter-auditory still asks the wrong question because independent contractor is a different question? Well, asking whether it was an agent, that would have been the right one under these instructions. An agent could have been maybe the jury thought, well, maybe it's an employee. What if they said, no, he was not an agent? Then you know what? If I get the inter-auditory and they say, no, he's not an agent, then he could be an employee, couldn't he? Right? I mean, there was testimony that he considered himself to be an employee. I mean, it's going to be one or the other. Under the instructions. A servant or employee is an agent. That's what the jury was instructed. But one may be an agent, although he is neither a servant nor an employee. So they're saying the question, the right question is, was he an agent? And that's not the question. That's not the inter-auditory intended. But I think the whole theory of liability, vicarious liability, was agency, right? Right. So why wouldn't the proper question be, was McClellan an agent of the corporate defendants? No, he was not their agent. What would you say to that? You'd say I win. Well, I think they'd be saying he could have been. He could be saying whatever he wants. No, I know. You and I both know what the answer to that is. No, you lose. But the independent contractor wins. But the way the instruction reads. How about the question? We're talking about the question. You ask, is he an independent contractor? Right. What is that answer if they say, yes, he was? Well, if you would ask the jury questions, I'm not going to say he was. If you would ask if the question was, was he an agent of the corporate defendants? And they came back and said, no, he was not their agent. I think he'd be in pretty good shape at that point. I didn't get any inter-auditory. If I got the inter-auditory that was read in conjunction with the, I understand what you're saying. But what I'm saying is the flip side of that is under the instructions. I also win if they say, yes, he's an independent contractor. Under the instructions, they also asked for an instruction of you can be both. And you objected and you won that. That's right. Right. So you've got a lot of balls up in the air that you can choose to hit. Look, all I'm saying is if they answer this inter-auditory, you know what? Maybe it could have been agent. I'm happy with the way this was drafted. Maybe it could have been agent. But that doesn't foreclose under the jury instructions. Unless they answer, yes, he's an independent contractor, the jury's just been told in the last sentence of the 5010 instruction, and by the way, the 5010 instruction is the approved instruction. Judge Harmon had to give that instruction. It's the approved instruction. It says if he's an independent contractor, we're not liable for Jacobi-McCollins negligence. Could it have been drafted to say agent? Maybe. As I think about it, okay. That wasn't their argument until I heard it today, but okay, fine. Under the instruction, I'll guess what it is. Okay. Enough on that. As far as the food delivery cases, because this relates to count five. This case is not like the food delivery cases. In the pizza case, Groschen v. Emos, there's actually a policy that dictates, that says that if he's running late, he can be fired. There's a very similar contractor policy about whether Jacobi-McCollins is going to be fired if he's running late for an appointment, and it wouldn't have made any sense. It's not the same type of business. There's a difference between delivering food and delivering in-home presentations. There isn't a single case that they cited. There isn't a single case that we've been able to discover that has ever imposed a duty to train and supervise licensed drivers without a specific policy that foreseeably and affirmatively increases the risk of harm to the public. The manual says get directions, don't rely on MapQuest. Even if you construe it to say, well, does that say anything about use, which I think may have been the first question in this case that we got to take. Well, there's a difference between saying something is not said in the manual, right, and something that is affirmatively a policy. Well, in the Jimmy John's case, they said deliver this sandwich in 15 minutes. That's their whole national advertising campaign. There just isn't anything comparable here when we are saying use your GPS on your phone. Use MapQuest on your phone, even though the law in Illinois in 2014 when this accident happened was you can't use a handheld device while driving. Jacobi O'Connor had a duty to comply with the rules of the road and the motor vehicle independent of any agreement that he had with us. On proximate cause, I haven't heard anything from counsel today about how the mere possibility that a warning might have prevented the accident is enough to show a causal relationship. We've said in the cases that say that it is not. You really are out of time. I'm out of time. Make your last point if you want to. I'm out of time, and all I'll say is I know that our argument is a privilege, and I hope I haven't said or done anything today maybe in the zeal of my advocacy. We are thankful for the time that the court has spent and the attention directed to this case, and for all the reasons set forth in our brief, we ask for either a January or a new trial. Thank you very much. We appreciate the excellent lawyering really on both sides of this case. It's always a pleasure. Thank you. I think we are in recess.